**UNITED STATES v. DURKIN.**

Nos. 14329–14331, 14334, 14335, 14557, 14558.

District Court, N. D. Illinois, E. D.

Nov. 29, 1945.

J. Albert Woll, U. S. Atty., Wm. J. Connor and Kenneth S. Nathan, Asst. U. S. Attys., all of Chicago, Ill., for the United States of America.

Henry L. Balaban, of Chicago, Ill., for defendant.

CAMPBELL, District Judge.

On February 17, 1926 Martin Durkin (hereinafter called the applicant) was indicted in this District for violation of the National Motor Vehicle Theft Act, 18 U.S.C.A. § 408, under indictment No. 14329.

This indictment charged the applicant with transporting in Interstate Commerce from Pasadena, Cal., to Chicago, Ill., a Packard Sedan Automobile stolen on September 23, 1925. On October 21, 1926, the applicant was convicted by a jury of this offense and on November 8, 1926, was sentenced by the Honorable Adam C. Cliffe, since deceased, to five years in a United States Penitentiary.

On July 27, 1926, three and one-half months before the above conviction and sentence, the applicant was tried and convicted in the Criminal Court of Cook County, Ill., of the murder of Special Agent Shanahan of the United States Department of Justice, and sentenced to serve thirty-five years in the State Penitentiary.

The sentence by Judge Cliffe provided that it was to take effect upon the applicant's release from custody by the authorities of the State of Illinois.

Between February 17th and April 30th, 1926, indictments Nos. 14335, 14330, 14331, 14334, 14557 and 14558, were returned against the applicant in this District, charging him in each indictment with a further violation of the National Motor Vehicle Theft Act. The substance of these charges was that the applicant transported stolen automobiles through the states of Illinois, Indiana, Ohio, New York and Missouri during the years 1924 and 1925.

On November 5, 1926, the applicant was found guilty by a jury in case No. 14335 and on November 8, 1926, was sentenced by Judge Cliffe to serve a term of five years in this case, the sentence to be consecutive to that imposed in case No. 14329.

Also on November 8, 1926, Judge Cliffe entered an order consolidating causes Nos. 14330, 14331, 14334, 14557 and 14558, and the applicant pleaded guilty in each case and was sentenced to one year and one day in the United States Penitentiary on each indictment. These were consecutive sentences to commence upon completion of the five year sentence given under Indictment No. 14335, making the total sentences fifteen years and five days.

Following said imposition of sentences the applicant was on November 8, 1926, received by the authorities of the State Penitentiary to commence service of his State sentence.

On August 8, 1945, the applicant was released from the State Penitentiary at Statesville, Ill., and turned over to the United States Marshal of this District to begin the service of the above mentioned sentences.

On the day of such release a petition for a writ of habeas corpus (No. 45C1331) was filed in this court and heard by the Honorable Michael L. Igoe. This petition was denied on September 12, 1945, and the applicant remanded to the custody of the United States Marshal. On September 17, 1945, a Notice of Appeal was filed and on September 25, 1945, Judge Igoe stayed the execution of all sentences, pending disposition of the appeal.

On September 17, 1945 Causes Nos. 14329, 14335, 14330, 14331, 14334, 14557 and 14558 were assigned by the Executive Committee of this Court to my calendar.

On September 19, 1945, an application for probation was filed in each of the said causes and was by this court referred to the Office of the Probation Officer for investigation and report.

The court has received the report of the Probation Officer which contains a history of the applicant's criminal activities preceding his arrest and conviction hereinabove set forth. The report also contains a statement made by the applicant to the probation officer, the applicant's family history, marital status,

home and neighborhood, education, religion, interests and associates, health, employment, military service, resources and a summary, all of which the court has carefully read and considered.

The Probation Officer's report abounds in detail and contains a history of the applicant's criminal activities preceding his arrest on January 20, 1926. To mention a few:

In June, 1922, while being in the custody of the police and driving a car to a police station he jumped from his car into the midst of a number of school children, thus preventing any shooting, and escaped.

In August, 1923, he was arrested for driving a stolen automobile and again escaped from a moving car.

In October, 1924, he is reported to have stolen an automobile in New York and had a gun battle with three police officers wherein all three were shot and injured.

In December, 1924, in the act of burglarizing a home in Chicago the applicant had a gun battle with three police officers who were wounded, the applicant being shot in the leg. Shortly after this he was found in a Cicero hotel by the police but managed to escape.

In May, 1925, at Sacramento, Cal., he was apprehended in the act of burglarizing a place, opened fire and escaped in a stolen automobile. Later on he was arrested for this offense and again escaped from the police.

On the evening of October 11, 1925, at 6245 Princeton Avenue, Chicago, the applicant drove a stolen Packard automobile into a garage there located and when being accosted by Special Agent Shanahan of the United States Department of Justice, shot and killed him.

On October 28, 1925, when Chicago police were waiting to arrest the applicant, he shot his way out in the course of which Policeman Gray was shot and killed and the applicant escaped.

At Hudson, N. Y., in December, 1925, he again escaped from the police.

In January, 1926, he was arrested on a train by agents of the Federal Bureau of Investigation and members of the St. Louis Police Department. He boasted when arrested that he would have shot it out with the officers if he had been given the opportunity. Two pistols, a .45 and .42 caliber, were found in his compartment on the train.

According to this report, the applicant during the several years preceding the fatal shooting of Agent Shanahan, in addition to his many crimes of stealing automobiles and transporting them in interstate commerce, committed a number of burglaries. The proceeds of several of these burglaries were found in the home of the applicant's mother.

The police records indicate that for the several years preceding his last arrest the applicant was constantly engaged in the commission of crimes throughout the United States, so that at the time he killed Agent Shanahan he was generally regarded as a notorious and hardened criminal with no thought or regard for a citizen's life or property. His pistol was kept in constant readiness to be used in case of threatened arrest. From October 11, 1925, the date of the death of Shanahan, until January 20, 1926, the date of his arrest—three and one-half months —he was a fugitive from justice, well-knowing he was wanted for the killing of not only Agent Shanahan but also Police Officer Gray.

When finally arrested for the killing of Agent Shanahan, he was brought to Chicago and the records before the Court show that newspaper accounts of his criminal activities publicized the fact that he was a notorious criminal.

Undoubtedly the late Judge Cliffe who sentenced this applicant in the causes now before this court regarded the applicant as a notorious criminal and would have denied an application for probation had one been timely made. It is furthermore clear by his sentence that he intended the applicant to serve such sentence in a United States Penitentiary as soon as he had completed service of his State sentence.

In now considering this application for probation it must be considered as of the date when the trial judge sentenced the applicant, a point which counsel for both the Government and the applicant have seemingly overlooked in their briefs.

Setting aside for the moment the jurisdictional challenge made by the Government in its answer and directing attention to whether the ends of justice will be subserved by placing this applicant on probation, the statute and the

intent of the Congress in passing it, must be given foremost consideration.

██ Since the passage of the Federal Probation Act, 18 U.S.C.A. § 724 et seq., there has been a marked tendency on the part of some to treat this Act as one conferring upon the courts similar power to that conferred upon the President of the United States under Section 2, Article II of the Constitution, viz: the power of the Chief Executive to pardon and reprieve for offenses committed against the United States.

That this is a misconception of the true purpose of the Act, and a clear abuse of judicial power, is apparent to all who properly understand the true theory upon which the three co-ordinated branches of our government are founded.

It will be admitted by all familiar with the background of probation legislation, and the authorities construing it, that it was intended to provide "an individualized program offering a young or unhardened offender an opportunity to rehabilitate himself without institutional confinement under the tutelage of a probation official", "a means of restoring offenders who are good social risks to society", "to give young and new violators of law a chance to reform and escape the contaminating influence of association with hardened or veteran criminals in the beginning of the imprisonment".

A study of the various Probation Acts in operation throughout the United States, including our own State, will reveal this fact. The entire history and background surrounding probation laws demonstrates clearly they were never intended to be used to defeat the ends of justice by extending their use to the hardened criminal class.

One who has had some experience in the enforcement of the criminal laws knows there are certain persons who coldly and deliberately choose a life of crime —men and women who have decided to be enemies of organized society by making their living through lawbreaking. These persons expect the law to catch up with them and when apprehended and prosecuted for their crimes, cunningly plan to do everything in their power to defeat the ends of justice.

There have been instances where, after putting their government to the expense of apprehension and conviction, such persons have been placed upon probation and in each of such instances the ends of justice have been defeated.

It is a regrettable fact that courts sometimes commit innocent error in being parties to such miscarriages of justice, and, either by being unduly imposed upon or through unwarranted sympathy, allow persons to escape the punishment they deserve. This is unfortunate. However, these are some of the things the hardened criminal considers in computing his percentage of successfully escaping the law.

What then did the Congress of the United States mean when it provided that only when the ends of justice and the public good are subserved shall offenders against the criminal laws of the United States be placed on probation?

It is true the Congress did not see fit, like many of the States, to incorporate specific language into the Probation Act placing a limitation on the courts as to the class of persons permitted to be released upon probation, but common sense, as well as a respect for the power granted solely to the Executive Branch of the Government, tells us the courts should not, by extending its privileges to the hardened criminal, use the Probation Act as a substitute for Executive Clemency or Presidential Pardon.

The courts by such use of the Probation Act usurp the power of the Executive and the administration of justice comes in for deserved public criticism. Following this comes disrespect for the courts by the public generally and the hardened criminal is encouraged to continue his work of crime.

In providing for a system of probation and authorizing the suspension of final judgment and the imposition of sentence upon persons found guilty of crimes and offenses, certain States have excluded such persons from the benefits of such legislation as were previously convicted of a crime greater than a misdemeanor. In all of these acts will be found language which requires the court before granting probation to be satisfied that there is reasonable ground to believe the best interests of society will be subserved even though the applicant be a first offender.

██ The power to place on probation, lodged in the Judicial Branch of the Government in deserving cases, is not an act of grace intended to exempt the individ-

574

ual on whom it is bestowed from the punishment the law inflicts for a crime he has committed. If this were true the Probation Act would have the same legal effect, and certainly the same practical effect, as pardon.

The power of the court to grant probation to a convict after his conviction, or after a plea of guilty, by suspending the imposition or execution of sentence, is founded upon considerations of the public good and is to be exercised on the ground that the public welfare, which is the legitimate object of all punishment, will be as well promoted by a suspension as by an execution of the sentence. Contrary to the dramatically expressed opinion of applicant's counsel in his appeal to the sympathy of the Court it is not a personal favor nor a private act of grace from the court who happens to possess such power, and is never to take the place of clemency by the President under the Constitution.

Turning to the question of jurisdiction raised by the government's answer to this application for probation, the court is required to decide whether or not it has the power to grant probation assuming the facts justify such action. The Probation Act gives sentencing courts the "power, after conviction or after a plea of guilty or nolo contendere for any crime or offense not punishable by death or life imprisonment, to suspend the imposition or execution of sentence and to place the defendant upon probation for such period and upon such terms and conditions as they may deem best." 18 U.S.C.A. § 724.

The record here discloses there was a verdict of guilty and the defendant was sentenced on such verdict. Before this no motion or application was made for probation and the facts then existing perhaps explain clearly the reason why such application was not made. The term at which the sentences were imposed has long since expired and no motion to vacate or set aside such sentences was ever made.

In support of applicant's argument that the court has jurisdiction of the subject matter various authorities were cited.

█ The court has carefully considered each of these citations and is of the opinion that they are not authority for holding under the circumstances in this case that the court has jurisdiction. It is true the Probation Act is a remedial statute and should be given a liberal construction. That, however, is not authority for conferring jurisdiction upon the court where none exists.

█ No case is cited by applicant's counsel which holds the court has the power to vacate, alter or modify its judgment or sentence after the expiration of the term at which such judgment was rendered or sentence imposed, unless a separate proceedings establishes that the judgment was erroneous or void and that the sentence should not have been imposed. United States v. Mayer, 235 U. S. 55, 35 S.Ct. 16, 59 L.Ed. 129; and Lockhart v. United States, 6 Cir., 136 F.2d 122, clearly hold that the Court does not have such power.

The Government in its brief has cited a number of authorities, United States v. Murray, 275 U.S. 347, 48 S.Ct. 146, 72 L.Ed. 309; Trant v. United States, 7 Cir., 90 F.2d 718; United States v. Albrecht, 7 Cir., 25 F.2d 93; Cisson v. United States, 4 Cir., 37 F.2d 330, to support its view the court lacks jurisdiction to grant probation in the instant case because the execution of the sentence had begun before the motion for probation was filed. The authorities cited by the Government support this statement.

Mr. Chief Justice Taft said in United States v. Murray [275 U.S. 347, 48 S. Ct. 149], supra: "The great desideratum was the giving to young and new violators of law a chance to reform and to escape the contaminating influence of association with hardened or veteran criminals in the beginning of the imprisonment. Experience had shown that there was a real locus pœnitentiæ between the conviction and certainty of punishment, on the one hand, and the actual imprisonment and public disgrace of incarceration and evil association, on the other. If the case was a proper one, great good could be done in stopping punishment by putting the new criminal on probation. The avoidance of imprisonment at time of sentence was therefore the period to which the advocates of a Probation Act always directed their urgency. Probation was not sought to shorten the term. Probation is the attempted saving of a man who has taken one wrong step, and whom the judge thinks to be a brand who can

be plucked from the burning at the time of the imposition of the sentence. The beginning of the service of the sentence in a criminal case ends the power of the court even in the same term to change it. Ex parte Lange, 18 Wall. 163 [85 U.S. 163], 21 L.Ed. 872. Such a limit for probation is a natural one to achieve its end.

In the same case Chief Justice Taft also said: "With this interpretation of the statute it must be decided that the District Court neither in the Murray Case, nor in the Cook Case, had power to grant probation. It is true that there was but one day of execution of the sentence in the Murray Case, but the power passed immediately after imprisonment began and there had been one day of it served."

■ Properly interpreted the Probation Act requires an application for probation must be made after conviction or plea of guilty and before the sentence is imposed. The Probation Act confers upon the court the power to suspend the imposition or execution of the sentence, not to vacate it, set it aside or change it long after the term has expired at which the judgment was entered and the sentence was imposed. United States v. Benz, 282 U.S. 304, 51 S.Ct. 113, 75 L. Ed. 354; Roberts v. United States, 320 U.S. 264, 64 S.Ct. 113, 88 L.Ed. 41.

■ With the record here showing that on August 8, 1945, the applicant was released from the State Penitentiary and delivered to the United States Marshal to begin the service of his sentence and on September 12, 1945, a petition for habeas corpus, which was filed on August 8, 1945, being denied and the applicant remanded to the custody of the United States Marshal and five days later a petition for notice of appeal from such decision denying the writ of habeas corpus, coupled with the fact that he was actually serving his sentence when the application for probation was filed, of itself conclusively establishes that the court has lost jurisdiction to grant probation without mention that the term of court at which the original judgment was entered expired in May, 1926. The rule of law is too well established to warrant extended discussion that a court cannot set aside or alter its final judgment after the expiration of the term at which it was entered, unless special proceedings for that purpose are begun during such term.

Nothing will be found in the Probation Act which alters or changes this rule.

The Government in its brief has correctly stated the fact that the applicant was taken into custody at the Illinois Penitentiary by the United States Marshal, and that his authority for such action was the original commitments issued in these cases. These commitment papers were issued, as the record discloses, after Judge Cliffe, the sentencing judge, had entered the judgments and imposed the sentences. These judgments were never altered or changed or in any way disturbed for the many years following their entry down to and including this date. Nowhere in the petitioner's brief is it asserted or contended any action was ever taken prior to August 8, 1945, to question the validity of these judgments or the imposition of the sentences.

The sentencing of the applicant here and the expiration of the term at which sentences were imposed, coupled with the fact that the applicant had commenced the service of his sentences defeats the jurisdiction of this court.

■ Applicant's counsel lays much stress upon the fact that he has not commenced serving his sentences because the habeas corpus proceeding filed by him had the effect of giving notice that he, the applicant, did not intend to enter upon said service or give his consent to enter upon said service.

This court is of the opinion that the applicant's intent or withholding of consent to enter upon the service of his sentences is not controlling. The stay of sentences and of the mittimi was not entered until September 25, 1945. Service of the applicant's sentence commenced on August 8, 1945. Furthermore, the issues raised by applicant in the habeas corpus proceedings before Judge Igoe and decided adversely to applicant were that the sentences imposed by Judge Cliffe, the trial Judge, were erroneous because they lacked definiteness and certainty in their terms and the legal and essential requirements demanded of the cumulative sentence. Even assuming both of these propositions to be true they only go to the correctness of the sentences. They admit the premise that such sentences were entered and stand today as originally entered. This being true, this court is prohibited from granting probation by the very wording of the Probation Act.

■ Much has been said by counsel for the applicant in his original and reply briefs about the case of the State of Illinois v. Durkin and the nature of the proof offered by the State to secure that conviction. Further complaint is made by counsel for the applicant that evidence seeking to establish the applicant was an automobile thief and a violator of the National Motor Vehicle Theft Act was permitted by the State court in such trial to be received in evidence, and, therefore, by serving the sentence imposed for murder he has simultaneously discharged his debt to society for the offenses committed against the United States.

The court cannot agree with this view entertained by counsel for the applicant. The evidence thus described was offered by the State at the murder trial for the purpose of showing the applicant was a fugitive from justice; a person actually committing a felony at the time of the attempted arrest; a possessor of a stolen automobile at the time of the actual shooting of Agent Shanahan; a person who knew he was being sought by the authorities, and, therefore, his story that he believed Agent Shanahan to be a person attempting to rob him was untrue and not worthy of belief.

The Supreme Court of Illinois affirmed this judgment and approved this evidence and the purpose for which it was offered. A discussion of the evidence offered in that case under no circumstances could help the applicant's cause in this case.

■ Since so much has been said in both the applicant's briefs and the Government's brief regarding the question of whether, assuming the court had jurisdiction, the present case is a proper one for probation, it is only fair to the parties to state that what the court has said heretofore regarding the previous history of the applicant should be sufficient to indicate it would refuse to grant probation without confining its reason to one on jurisdictional grounds. The court, under the circumstances found here, if no jurisdictional question was presented, would be compelled to deny this application for probation on the merits.

To extend probation to this applicant would be a gross abuse of the court's power, a miscarriage and defeat of the ends of justice. It would be an extension of executive clemency by the Judicial Branch of the Government. Government by men and not by law should never find its way into the courts. Such abuse of power by the courts would not only bring criticism of a law intended for the good of society as a whole, but would sooner or later bring the entire system of probation into public disrepute.

Counsel for the applicant has made a stirring appeal for relief from the judgments and sentences here imposed. The court is of the opinion that everything said in this respect by counsel for the applicant is something which might more properly be alleged in an application for a pardon or a reprieve addressed to the President of the United States by one seeking release from imprisonment.

Counsel for the applicant has appealed to this court to use the vehicle of the Probation Act to extend executive clemency. As deeply moved or touched as any court could be by an appeal of this kind, it is powerless to grant the relief prayed for unless it either has the jurisdiction to do so, or the case falls within the class entitled to be considered a probationary case.

It is true the applicant has served a number of years in the State Penitentiary for the crime of murder and during his incarceration he has apparently endeavored to improve his condition and change his attitude towards society.

It is likewise true that perhaps he is sorry and penitent for the crimes he has committed and it seems apparent he is sincere in his desire to lead a straightforward life, but assuming all this to be true it does not follow that the ends of justice and the best interests of the public will be subserved by granting him probation.

The facts in this case do not warrant the court holding the applicant is such a person as the Congress intended should be granted relief under the Probation Act.

It is further clear that the Court is without jurisdiction to entertain the application for probation.

The application is denied.