## UNITED STATES v. BANKS.
### No. 7446.

United States District Court
D. Minnesota, Third Division.
Oct. 20, 1952.

C. U. Landrum, Sp. Asst. U. S. Atty., St. Paul, Minn., and Miles W. Lord, Asst. U. S. Atty. for Minnesota, Minneapolis, Minn., for United States.

John W. Graff, Jerome Hoffmann and Richard E. Kyle, St. Paul, Minn., for defendant.

BELL, District Judge.

Thomas W. Banks, the above named defendant, was indicted for income tax evasion for the years 1945, 1946, and 1947 in violation of 26 U.S.C. § 145(b). The total tax evasion was alleged to have amounted to more than $50,000. He was tried before a jury in May, 1952, and found guilty on all three counts. On June 23, 1952, a general sentence of three years in the penitentiary and a fine of $10,000 was imposed.

A motion for a new trial was presented and overruled. An appeal was taken to the United States Court of Appeals for the Eighth Circuit, which was filed on July 9, 1952 and which is still pending.

The case now is before the court on a motion for a modification of the sentence and for suspension of the sentence and the application of probation under the Federal Probation Act, 18 U.S.C. § 3651, which provides:

"Upon entering a judgment of conviction of any offense not punishable by death or life imprisonment, any court having jurisdiction to try offenses against the United States, except in the District of Columbia, when satisfied that the ends of justice and the best interest of the public as well as the defendant will be served thereby, may suspend the imposition or execution of sentence and place the defendant on probation for such period and upon such terms and conditions as the court deems best."

 The Probation Act conferred on District Courts of the United States the power, when satisfied that the ends of justice and the best interests of the public as well as of the defendant, would be subserved by suspending the imposition or execution of sentence. The chief objective of the act is to allow a period for supervision by an officer of the court to aid in the rehabilitation of a penitent offender and to offer an opportunity for reformation which actual service of the suspended sentence might make less probable. The provisions of the act generally are applied by the courts in dealing with first offenders, those who have made a mistake for the first time but whose character and background indicate a possibility of future good conduct. In dealing with hardened criminals, violators who have acquired a criminal record, persons who violate the law for profit, the smart offenders who are willing to risk detection, the courts usually have denied probation under the act. Obviously Congress did not intend for the Probation Act to be used by the courts to suspend the imposition or execution of sentence and eliminate punishment of persons deliberately engaged in violating the law. Especially is this true where persons repeatedly have been convicted of violations of the law and have shown by their attitude and conduct that the court cannot expect them to benefit by supervision under the act.

The application of probation in a deserving case is a humanitarian act of the court that invites the approbation of society, while its use in an unworthy case breeds contempt for the law. Justice properly may be tempered with leniency if sound judgment is used in selecting the subjects of the court's bounty, but the criminal class must understand that when laws are wilfully and intentionally violated punishment will be certain, fearless and adequate. Enforcement of the law is essential to good government and the most effective way to prevent crime is to punish criminals.

 The law imposes no requirement on the court to extend probation. It is a favor bestowed by the court on persons deemed worthy of the court's supervision. Probation cannot be demanded as a right, rather it may be conferred only as a privilege. Flexibility in administration is essential to an extensive degree. Each case must be analyzed to give a careful, comprehensive consideration so as to evaluate the character, qualities and possibilities of each offender, and this requires an exercise of a broad discretion.

The foregoing principles have been sustained by the courts in many decisions showing a remarkable accord in the interpretation and the applicability of the act. United States v. Murray, 275 U.S. 347, 48 S.Ct. 146, 72 L.Ed. 309; Roberts v. United States, 320 U.S. 264, 64 S.Ct. 113, 88 L.Ed. 41; United States v. Johnson, D.C., 56 F.2d 658; United States v. Nix, D.C., 8 F.2d 759; United States v. Durkin, D.C., 63 F. Supp. 570.

Mr. Chief Justice Taft prescribed the scope of the Probation Act in United States v. Murray, supra [275 U.S. 347, 48 S.Ct. 149], as follows:

"The great desideratum was the giving to young and new violators of law a chance to reform and to escape the contaminating influence of association with hardened or veteran criminals in the beginning of the imprisonment. Experience had shown that there was a real locus poenitentiae between the conviction and certainty of punishment, on the one hand, and the actual imprisonment and public disgrace of incarceration and evil association, on the other. If the case was a proper one, great good could be done in stopping punishment by putting the new criminal on probation. The avoidance of imprisonment at time of sentence was therefore the period to which the advocates of a Probation Act always directed their urgency. Probation was not sought to shorten the term. Probation is the attempted saving of a man who has taken one wrong step, and whom the judge thinks to be a brand who can be plucked from the burning at the time of the imposition of the sentence. * * *"

Mr. Chief Justice Black in Roberts v. United States, supra [320 U.S. 264, 64 S.Ct. 117], said:

"In no way does it impair the Act's usefulness as an instrument to accomplish the basic purpose of probation, namely to provide an individualized program offering a young or unhardened offender an opportunity to rehabilitate himself without institutional confinement under the tutelage of a probation official and under the continuing power of the court to impose institutional punishment for his original offense in the event that he abuse this opportunity. To accomplish this basic purpose Congress vested wide discretion in the courts. See Burns v. United States, 287 U.S. 216, 53 S.Ct. 154, 77 L.Ed. 266. Thus Congress conferred upon the courts the power to decide in each case whether to impose a definite term of imprisonment in advance of probation or to defer the imposition of sentence, the alternative to be adopted to depend upon the character and circumstances of the individual offender."

In United States v. Johnson, supra [56 F.2d 659], the court said:

"The probation law is founded upon humanitarian considerations, and is designed to prevent crime and restore to the ranks of upright citizens many, who through ignorance, youth, inexperience, or weakness of will, have been guilty of infractions of the law. From its very nature, however, this law can be easily abused if courts and officials concerned in its administration allow their sympathies alone to dictate their actions. Probation should not be so commonly granted that fear of punishment loses its preventive force. A tendency in this direction has already been observed, and has produced a natural reaction, so that we find that the repeal of this beneficent law is being advocated by students of criminology. If that result is to be averted, firmness and good judgment must not be subordinated to the quality of mercy in its administration. I think the true scope of the law is found in dealing with young and first offenders, where the possibility is plainly indicated that they may, in spite of a single departure from rectitude, be retained in the ranks of their law-abiding fellow citizens. As Judge Bourquin has so well pointed out in United States v. Meagher, D.C., 36 F.2d 824, 825, in behalf of these thoughtless young, probation

may serve a useful purpose, but it should not be extended to the mature where the crime is premeditated and where committed for profit. In such cases defendants take the chances, and, when detected and convicted, they should take the consequences. First offender too often means first detected. 'To convicts treatment appropriate to their offenses * * * will go far to solve the problem of crime, farther than ought else save inculcation of good morals from youth to age.'

"Probation is intended as a substitute for imprisonment in certain cases to effect a reform and avoid the contamination of time in prison, neither of which would be effective here. It is obvious that to grant probation in this case would be to depart from the purpose of the law generally and of the probation law in particular. * * *"

In United States v. Nix, supra [8 F.2d 760], the court, in commenting on the Probation Act, said:

"In extreme cases, and in cases of more or less minor offenses, probation is being granted under supervision of special volunteer probation officers, appointed for each particular case. However, the placing upon probation generally requires an extensive investigation to be made by competent officers of the government. The court should, through its own official channels, be able to secure detailed written data covering the circumstances of the offenses, the previous record, character, family history, home conditions, mental and physical conditions, habits, associations, and other important facts regarding the accused. In many cases medical certificates will be required. The law clearly contemplates, and the situation necessarily requires, that when probation is granted there must be close supervision of the probationer, and systematic reports submitted to the court.

"No hard and fast rule can be laid down as to the type of offenders who should be considered for probation. I have heretofore in several cases expressed my general views on this subject. It is my view that the Congress, in passing the Probation Law, had in mind particularly juvenile offenders, youthful offenders, first offenders, and offenders whose release on probation will not endanger the public, and where there is reason to believe that the individual will make a serious effort to overcome the abnormalities and difficulties which brought him into court. In general, the offenses contemplated, as I view it, would be largely those of a more or less minor character, or those induced by youth, inexperience, mental abnormalities, physical abnormalities, ignorance, poverty, superstition, jealousies, or heat of passion. Conversely, I do not think that the law, except in very rare cases, should have application to hardened, habitual criminals, to those who need to be restrained as a matter of protection to themselves and to society, or to those of mature years, of fair education, of broad experience, who have committed some very deliberate offense. A survey of the probation systems of the several states supports this view."

In United States v. Durkin, supra [63 F.Supp. 573], the court said:

"Since the passage of the Federal Probation Act, 18 U.S.C.A. § 724 et seq., there has been a marked tendency on the part of some to treat this Act as one conferring upon the courts similar power to that conferred upon the President of the United States under Section 2, Article II of the Constitution, viz: the power of the Chief Executive to pardon and reprieve for offenses committed against the United States.

"That this is a misconception of the true purpose of the Act, and a clear abuse of judicial power, is apparent to all who properly understand the true theory upon which the three coordinated branches of our government are founded.

"It will be admitted by all familiar with the background of probation legislation, and the authorities construing it, that it was intended to provide 'an individualized program offering a young or unhardened offender an opportunity to rehabilitate himself without institutional confinement under the tutelage of a probation official', 'a means of restoring offenders who are good social risks to society', 'to give young and new violators of law a chance to reform and escape the contaminating influence of association with hardened or veteran criminals in the beginning of the imprisonment'.

"A study of the various Probation Acts in operation throughout the United States, including our own State, will reveal this fact. The entire history and background surrounding probation laws demonstrates clearly they were never intended to be used to defeat the ends of justice by extending their use to the hardened criminal class.

"One who has had some experience in the enforcement of the criminal laws knows there are certain persons who coldly and deliberately choose a life of crime—men and women who have decided to be enemies of organized society by making their living through lawbreaking. These persons expect the law to catch up with them and when apprehended and prosecuted for their crimes, cunningly plan to do everything in their power to defeat the ends of justice.

"There have been instances where, after putting their government to the expense of apprehension and conviction, such persons have been placed upon probation and in each of such instances the ends of justice have been defeated.

"It is a regrettable fact that courts sometimes commit innocent error in being parties to such miscarriages of justice, and, either by being unduly imposed upon or through unwarranted sympathy, allow persons to escape the punishment they deserve. This is unfortunate. However, these are some of the things the hardened criminal considers in computing his percentage of successfully escaping the law.

"What then did the Congress of the United States mean when it provided that only when the ends of justice and the public good are subserved shall offenders against the criminal laws of the United States be placed on probation?

"It is true the Congress did not see fit, like many of the States, to incorporate specific language into the Probation Act placing a limitation on the courts as to the class of persons permitted to be released upon probation, but common sense, as well as a respect for the power granted solely to the Executive Branch of the Government, tells us the courts should not, by extending its privileges to the hardened criminal, use the Probation Act as a substitute for Executive Clemency or Presidential Pardon.

"The courts by such use of the Probation Act usurp the power of the Executive and the administration of justice comes in for deserved public criticism. Following this comes disrespect for the courts by the public generally and the hardened criminal is encouraged to continue his work of crime.

"In providing for a system of probation and authorizing the suspension of final judgment and the imposition of sentence upon persons found guilty of crimes and offenses, certain States have excluded such persons from the benefits of such legislation as were previously convicted of a crime greater than a misdemeanor. In all of these acts will be found language which requires the court before granting probation to be satisfied that there is reasonable ground to believe the best interests of society will be subserved even though the applicant be a first offender.

"The power to place on probation, lodged in the Judicial Branch of the Government in deserving cases, is not an act of grace intended to exempt the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed. If this were true the Probation Act would have the same legal effect, and certainly the same practical effect, as pardon.

"The power of the court to grant probation to a convict after his conviction, or after a plea of guilty, by suspending the imposition or execution of sentence, is founded upon considerations of the public good and is to be exercised on the ground that the public welfare, which is the legitimate object of all punishment, will be as well promoted by a suspension as by an execution of the sentence. Contrary to the dramatically expressed opinion of applicant's counsel in his appeal to the sympathy of the Court it is not a personal favor nor a private act of grace from the court who happens to possess such power, and is never to take the place of clemency by the President under the Constitution."

Certain very controlling facts in this case should be considered in the light of the above quotations:

The defendant in November, 1929, entered a plea of guilty to a charge of conspiracy to violate the National Prohibition Act, 27 U.S.C.A., and paid a fine of $2,500. In March, 1934, he entered a plea of guilty to a similar charge and paid a fine of $2,000. Both charges were felonies.

Subsequent to the prohibition era the defendant and his associates conducted many food serving and liquor dispensing places in Minneapolis and other cities. For a long period of time he has been interested in slot machines, coin-operated devices and gambling places. During the greater part of his active life the defendant has been engaged in business on an extensive scale and has owned property of large value. He is experienced in modern business affairs and methods. He has employed lawyers, accountants, and experts in taxation. His liquor licenses have not always been legal. He has failed to keep proper books and records of his transactions. The greater part of his business has been done with the use of money and without using banks or the usual methods by which business affairs customarily are transacted.

Reports of law violations and on the whole a corrupt situation in the city of Minneapolis lead to an investigation by the United States of the defendant's tax liability for the period 1921 to 1933. An additional tax liability was established and the taxes paid by the defendant in 1937. During the investigation the defendant refused to cooperate with the investigators, one of the reasons for the length of time required for the work.

In the investigation leading to the indictment in this case proper books and records were not made available to the agents of the government. Again the agents were confronted with a lack of cooperation, and a long period of time was required to ascertain the facts. Indeed, the agents of the government and the court in the trial of the case could establish the defendant's tax liability only by the "net-worth method." However, the evidence was sufficient to sustain a finding of a tax evasion for the years 1945, 1946, and 1947 of more than $32,000.

The record in this case shows that the defendant owned an interest in the Casa Blanca Cafe in the city of Minneapolis wherein a man at a late hour in the night in 1945 was shot and killed. The defendant in this case was present when the shooting occurred. Later one Shetsky was indicted for the murder of the deceased, tried twice in the state courts for the crime, once convicted and sentenced to the penitentiary at Stillwater, Minnesota. During the first trial Shetsky left the courtroom, absconded and later was found in California, thereupon was returned to Minnesota, tried a second time and acquitted. When Shetsky absconded during the first trial of his case, his bond was forfeited and it was ascertained that the defendant Banks had contributed $5,000 of a $20,000 bond.

It has been urged that the defendant is a kindly, generous individual and has made contributions to friends, worthy organizations and persons in need. The tax evasions for the years 1945, 1946, and 1947 were quite sufficient to purchase a reputation for generosity.

The attention of the court has been directed to the fact that the defendant has not been convicted of a law violation since 1934 and that if he ever possessed criminal inclinations he has reformed and is now entitled to the consideration of a first offender. Unfortunately, this is not conclusive proof that no violations have been committed during the intervening period.

The defendant came into court for the trial of this case represented by three able, experienced lawyers who vigorously represented him at every step of the trial. A jury carefully selected under the rules of court was placed in the custody of the United States Marshal throughout the trial, segregated from public contact and influence and all newspaper articles pertaining to the trial withdrawn from the jurors. The trial covered a period of two weeks and the rights of the defendant were fully protected at all times.

The defendant is about sixty-four years of age, married and without children. He is intelligent, experienced in business, and has been successful and prosperous in his affairs. Unfortunately, he has conducted his business at times in violation of the laws of the federal, state and local governments, and finally was brought to the bar of justice. The court in this case is forced to the conclusion that the defendant is not the type of person who would be influenced or who would profit by the supervision of a probation officer. To extend probation in this case would be an abuse of the court's power.

The government in response to the motion has urged that under the decisions of the Supreme Court of the United States and the Federal Rules of Criminal Procedure, 18 U.S.C., this court has no jurisdiction to modify or in any way reduce the sentence during the pendency of an appeal. It has been held that during the pendency of an appeal from a sentence, the District Court is without jurisdiction to modify its judgment by resentencing of the defendant. Berman v. United States, 302 U.S. 211, 58 S.Ct. 164, 82 L.Ed. 204. However, counsel for defendant has stated that the appeal in this case would be dismissed in the event probation is granted. Consequently, the decision of this question in view of the foregoing need not be determined.

It has been further urged by the government that under the Federal Rules of Criminal Procedure the motion is untimely since sentence was imposed June 23, 1952, and the motion was presented September 10, 1952, and that more than sixty days have expired since the date of sentencing. This question likewise is moot in view of the decision of the court that this is not a proper case for probation. The motion is overruled.