## ROBERTS *v.* UNITED STATES.

No. 19. Argued October 15, 18, 1943.—Decided November 22, 1943.

*Mr. Newton B. Powell,* with whom *Mr. Benton Littleton Britnell* was on the brief, for petitioner.

*Mr. Paul A. Freund,* with whom *Solicitor General Fahy, Assistant Attorney General Tom C. Clark, Messrs. Oscar A. Provost* and *W. Marvin Smith* and *Miss Melva M. Graney* were on the brief, for the United States.

Mr. JUSTICE BLACK delivered the opinion of the Court.

In April, 1938, petitioner pleaded guilty to a violation of 18 U. S. C. 409 and the District Court entered a judgment sentencing him to pay a fine of $250 and to serve two years in a federal penitentiary. Acting under authority of the Probation Act[1] the court then suspended execution of the sentence conditioned upon payment of the fine, and ordered petitioner's release on probation for a five-year period. The fine was paid and he was released. In June, 1942, the court after a hearing revoked the probation, set aside the original sentence of two years, and imposed a new sentence of three years. The Circuit Court of Appeals affirmed, 131 F. 2d 392. Certiorari was granted because of the importance of questions raised concerning administration of the Probation Act.

The power of the District Court to increase the sentence from two to three years is challenged on two grounds: (1) Properly interpreted the Probation Act does not authorize a sentence imposed before probation, the execution of which has been suspended, to be set aside and increased upon revocation of probation; (2) If construed to grant such power, the Act to that extent violates the prohibition against double jeopardy contained in the Fifth Amendment. We do not reach this second question.

If the authority exists in federal courts to suspend or to increase a sentence fixed by a valid judgment, it must be derived from the Probation Act. The government

---

[1] 43 Stat. 1259; 46 Stat. 503; 48 Stat. 256; 53 Stat. 1223, 1225; U. S. C. Title 18, §§ 724–728.

concedes that federal courts had no such power prior to passage of that Act. See *Ex parte United States,* 242 U. S. 27; *United States* v. *Mayer,* 235 U. S. 55; *Ex parte Lange,* 18 Wall. 163; *United States* v. *Benz,* 282 U. S. 304. In the instant case that part of the original judgment which suspended execution of the two-year sentence and released the petitioner on probation was authorized by the literal language of § 1 of the Probation Act (U. S. C. Title 18, § 724) granting the District Court power "to suspend the . . . execution of sentence and to place the defendant upon probation. . . ." But before we can conclude that the Act authorized the District Court thereafter to increase the sentence imposed by the original judgment we must find in it a legislative grant of authority to do four things: revoke probation; revoke suspension of execution of the original sentence; set aside the original sentence; and enter a new judgment for a longer imprisonment.

We are asked by the government to find this legislative grant in § 2 of the Act as amended (U. S. C. Title 18, § 725) a part of which is set out below.[2] It is clear that power to do the first two things, revoke the probation and the suspension of sentence, is expressly granted by § 2. It is equally clear that power to do the third, set aside the original sentence, is not expressly granted. If we find this power we must resort to inference.

Except by strained construction we could not infer from the express grant of power to revoke probation or suspension of sentence the further power to set aside the original

---

[2] "At any time within the probation period the probation officer may arrest the probationer . . . or the court which has granted the probation may issue a warrant for his arrest, . . . [and] such probationer shall forthwith be taken before the court. . . . Thereupon the court may revoke the probation or the suspension of sentence, and may impose any sentence which might originally have been imposed." 43 Stat. 1260; 48 Stat. 256.

sentence. Neither probation nor suspension of execution rescinded the judgment sentencing petitioner to imprisonment;[3] the one merely ordered that petitioner be released under the supervision of probation officials, the other that enforcement of his sentence be postponed. Upon their revocation, without further court action, the original sentence remained for execution as though it had never been suspended. Cf. *Miller* v. *Aderhold*, 288 U. S. 206, 211.

If then the power to set aside and increase the prison term of the original sentence is to be inferred at all from § 2, it must be drawn from the clause which empowers the court after revocation of the probation and the suspension of sentence to "impose any sentence which might originally have been imposed." It is undisputed in the instant case that the court could originally have imposed a three-year sentence. Therefore the existence of power to set aside the first judgment in order to increase the sentence would be a perfectly logical inference from the clause if it stood alone, because two valid sentences for the same conviction cannot coexist. But the clause cannot be read in isolation; it must be read in the context of the entire Act. And in the absence of compelling language we should not read into it an inferred grant of power which necessarily would bring it into irreconcilable conflict with other provisions of the Act.

To accept the government's interpretation of this clause would produce such a conflict. Section 1 of the the Probation Act provides the procedural plan for release on probation. After judgment of guilt, the trial court is

---

[3] Cf. *United States* v. *Pile*, 130 U. S. 280; *United States* v. *Weiss*, 28 F. Supp. 598, 599; *Pernatto* v. *United States*, 107 F. 2d 372; *Kriebel* v. *United States*, 10 F. 2d 762; *Ackerson* v. *United States*, 15 F. 2d 268, 269; *Moss* v. *United States*, 72 F. 2d 30, 32; *King* v. *Commonwealth*, 246 Mass. 57, 60, 140 N. E. 253; *Belden* v. *Hugo*, 88 Conn. 500, 504, 91 A. 369; *In re Hall*, 100 Vt. 197, 202, 136 A. 24.

authorized "to suspend the *imposition* or *execution* of sentence and to place the defendant upon probation. . . ." (Italics supplied.) By this language Congress conferred upon the court a choice between imposing sentence before probation is awarded or after probation is revoked. In the first instance the defendant would be sentenced in open court to imprisonment for a definite period; in the second, he would be informed in open court that the imposition of sentence was being postponed. In both instances he then would be informed of his release on probation upon conditions fixed by the court. The difference in the alternative methods is plain. Under the first, where execution of sentence is suspended, the defendant leaves the court with knowledge that a fixed sentence for a definite term of imprisonment hangs over him; under the second, he is made aware that no definite sentence has been imposed and that if his probation is revoked the court will at that time fix the term of his imprisonment. It is at once apparent that if we accept the government's interpretation this express distinction which § 1 draws between the alternative methods of imposing sentence would be completely obliterated. In the words of the government, any sentence pronounced upon the defendant before his release on probation would be a "dead letter." Thus the express power to suspend execution of sentence granted by § 1 would, by an inference drawn from § 2, be reduced to a meaningless formality. No persuasive reasons relating to congressional or administrative policy have been suggested to us which justify construing § 2 in this manner.

The ten-year legislative history of the Probation Act strongly suggests that Congress intended to draw a sharp distinction between the power to suspend execution of a sentence and the alternative power to defer its imposition. The first probation legislation was passed by Congress in 1917 but failed to receive the President's signa-

ture. As originally introduced this bill provided only for the suspension of imposition of sentence.[4] After extended hearings the Senate Judiciary Committee reported it with amendments including two which were intended to grant courts power to choose between suspending imposition and suspending execution.[5] But when the bill finally passed both Houses the power to suspend imposition had been eliminated and only the power to suspend execution remained.[6] Between 1917 and 1925, when the present Act was passed and approved by the President, the several congressional committees interested in probation legislation considered numerous bills. Some provided only for suspension of imposition, some only for suspension of execution, and some for either method as the court saw fit.[7] During this period there were advocates of those bills which provided for the suspension of imposition of sentence, but others opposed such bills. Attorney General Palmer, belonging to the latter group, expressed his opposition to a bill which provided for the suspension of imposition, pointing out that, "The judge may also, in his discretion, terminate the probation at any time within the period specified and require the defendant to serve not a sentence *which had been originally pronounced upon him,* but a sentence to be pronounced at the time of the termination of the probation for the act contemplates that in

[4] Hearings before subcommittee of the Committee on the Judiciary, U. S. Senate, on S. 1092, 64th Cong., 1st Sess., March 25, 1916, pp. 5, 6.

[5] Report No. 887, Senate Committee on the Judiciary, 64th Cong., 2d Sess.

[6] 54 Cong. Rec. 3637, 4373; Hearings before the House Committee on the Judiciary, 66th Cong., 2d Sess., on H. R. 340, 1111 and 12036, March 9, 1920, pp. 106–107, 112–113.

[7] Summaries of state legislation were inserted into the records of the committee hearings and many witnesses discussed such legislation. See, e. g., *Ibid.,* 123–130, 38–44. Like the bills before Congress, the state probation acts were not uniform in their treatment of suspension of sentence.

granting probation a court suspends *even the imposition of a sentence. . . .* The conferring of such powers upon judges would not, it seems to me, contribute to the proper and uniform administration of criminal justice." [8] (Italics supplied.) In the end Congress declined to adopt one method of suspension to the exclusion of the other and instead granted the courts power to apply either method according to the circumstances of each individual case. From this compromise of the conflicting views on the proper method of suspension we may conclude that Congress indicated approval of the natural consequences of the application of each method. As understood by Attorney General Palmer one of these consequences was that when the method of suspension of execution was used the defendant could be required to serve only the sentence which had been originally pronounced upon him.

A construction of the Act to preserve the distinctive characteristics of the two methods of suspension is not inconsistent with the manner in which it has been enforced and administered. From the passage of the Act until 1940 [9] the Attorney General exercised supervision over administration of the Act.[10] In 1930 the Attorney Gen-

---

[8] *Ibid.,* 105.

[9] In 1940 administration of the probation system was transferred to the Administrative Office of the United States Courts under the provisions of an Act passed August 7, 1939. 53 Stat. 1223, 1225.

[10] The original Act required probation officers to "make such reports to the Attorney General as he may at any time require." 43 Stat. 1261. In June, 1925, three months after enactment of the law, the Attorney General sent to all United States District Judges a memorandum of suggestions in which he comprehensively discussed the duties of judges and probation officers and requested that monthly reports be made to him concerning the probation activities in each court. See 1925 Annual Reports and Proceedings of the National Probation Association, 227–230. In 1930 an amendment to the Probation Act stated that the Attorney General should "endeavor by all suitable means to promote the efficient administration of the probation system and the enforcement of the probation laws in all United States courts." 46 Stat. 503, 504. See also 53 Stat. 1225.

eral in a carefully considered opinion reached the conclusion that if Congress had intended by § 2 of the Probation Act "to create such an important power, [as that for which the government here contends] it would seem that more explicit language would have been used." 36 O. A. G. 186, 192. A comprehensive two-volume report by the Attorney General entitled "Survey of Release Procedures" published in 1939 adopted this interpretation of § 2: "Where imposition of sentence was originally suspended and probation granted, and the probation and suspension are later revoked, it is plain that before the offender can be imprisoned imposition of sentence is necessary. And since the case reverts to its status at the time probation was granted, the court clearly is free to impose 'any sentence which might originally have been imposed.' 18 U. S. C. § 725 (1934). But where the court imposed sentence but suspended the execution of it, it would seem that when the suspension of execution is revoked the original sentence becomes operative." Significantly, the report further pointed out that "No case has been found wherein the court, upon revocation of suspension of execution, increased the original sentence." [11]

So far as pointed out to us the present and two other cases are the only ones in which federal courts have, upon revocation of probation, increased a definite sentence which had been imposed upon an offender prior to his release on probation. Cf. *United States* v. *Moore,* 101 F. 2d 56; *Remer* v. *Regan,* 104 F. 2d 704. The *Moore* case

[11] Attorney General's Survey of Release Procedures, Vol. I, p. 13. Asserting that there is a distinction between a decrease and an increase of sentence, the report further stated: "However, it has been held that when suspension of execution is revoked the court may modify the original sentence so as to decrease the term of imprisonment." *Ibid.* Two Circuit Courts of Appeals had construed the Act as authorizing in that circumstance a judgment which reduced the term of the original sentence. *United States* v. *Antinori* (C. C. A. 5), 59 F. 2d 171; *Scalia* v. *United States* (C. C. A. 1), 62 F. 2d 220.

was decided January 16, 1939, without discussion of the power of the court to increase the sentence. The *Regan* case was decided May 26, 1939, and the court pointed out that defendant apparently conceded that imposition of an increased sentence was authorized by the Probation Act. We have, therefore, an administration of the probation law from its passage in 1925 until 1939, in which the Attorney General not only assumed but expressly stated by official opinion that a definite sentence, execution of which had been suspended, could not be increased after the suspension had been revoked for breach of probation conditions; and in which the federal courts had apparently not undertaken to act contrary to the Attorney General's interpretation.

To construe the Probation Act as not permitting the increase of a definite term of imprisonment fixed by a prior valid sentence gives full meaning and effect both to the first and second sections of the Act. In no way does it impair the Act's usefulness as an instrument to accomplish the basic purpose of probation, namely to provide an individualized program offering a young or unhardened offender an opportunity to rehabilitate himself without institutional confinement under the tutelage of a probation official and under the continuing power of the court to impose institutional punishment for his original offense in the event that he abuse this opportunity. To accomplish this basic purpose Congress vested wide discretion in the courts. See *Burns* v. *United States,* 287 U. S. 216. Thus Congress conferred upon the courts the power to decide in each case whether to impose a definite term of imprisonment in advance of probation or to defer the imposition of sentence, the alternative to be adopted to depend upon the character and circumstances of the individual offender. All we now hold is that having exercised its discretion by sentencing an offender to a

definite term of imprisonment in advance of probation, a court may not later upon revocation of probation set aside that sentence and increase the term of imprisonment.

*Reversed.*

Dissenting opinion of Mr. Justice Frankfurter, in which the Chief Justice and Mr. Justice Reed concur.

The device of probation grew out of a realization that to make the punishment fit the criminal requires wisdom seldom available immediately after conviction. Imposition of sentence at that time is much too often an obligation to exercise caprice, and to make convicted persons serve such a sentence is apt to make law a collaborator in new anti-social consequences. Probation is an experimental device serving both society and the offender. It adds the means for exercising wisely that discretion which, within appropriate limits, is given to courts. The probation system was devised to allow persons guilty of anti-social conduct to continue at large but under appropriate safeguards. The hope of the system is that the probationer will derive encouragement and collaboration in his endeavors to remain in society and never serve a day in prison. The fulfillment of that hope largely rests on the efficacy of the probation system, and that depends on a sufficient number of trained and skilful probation officers. Thus the probation system is in effect a reliance on the future to reveal treatment appropriate to the probationer. In the nature of things, knowledge which may thus be gained is not generally available when the moment for conventional sentencing arrives. Since assessment of an appropriate punishment immediately upon conviction becomes very largely a judgment based on speculation, the function of probation is to supplant such speculative judgment by judgment based on experience. For this

reason probation laws fix a tolerably long period of probation, as, for instance, the five-year period of the Federal Probation Act.

In view of all that led to the adoption of probation and the light its workings have cast, the imposition of a suspended term sentence is meaningless if indeed it does not contradict the central idea underlying probation. A convicted person who is given a term sentence and then placed on probation hopes never to spend a day in prison. The court returning the probationer to the community likewise assumes that the influence of probation will save the probationer from future imprisonment. To treat the pronouncement of a term sentence as a kind of bargain whereby the probationer knows that, no matter what, he cannot be put in prison beyond the term so named is to give a wholly unreal interpretation to the procedure. We certainly should not countenance the notion that a probationer has a vested interest in the original sentence nor encourage him to weigh the length of such a sentence against any advantages he may find in violating his probation. To bind the court to such a sentence is undesirable in its consequences and violative of the philosophy of probation. As we pointed out very recently, the difference to a probationer between imposition of sentence followed by probation and suspension of the imposition of sentence "is one of trifling degree." *Korematsu* v. *United States,* 319 U. S. 432, 435. The fact is that term sentences of which the execution is suspended are likely to be as full of vagaries and as unrelated to insight relevant to treatment for particular individuals, as are term sentences the execution of which is not suspended. The capricious nature of such defined sentences dominates all statistical and other evidence regarding conventional judicial sentencing, e. g., *Criminal Justice in Cleveland* (1922) 303 *et seq.* and particularly Tables 20 and 21, and *Ambard* v. *Attorney General for Trinidad and Tobago* [1936] A. C. 322, and

has led to suggestions for more scientific methods of sentencing, see Smith, Alfred E., *Progressive Democracy* (1928) 209 *et seq.;* Warner and Cabot, *Judges and Law Reform* (1936) 156 *et seq.;* Cantor, *Crime and Society* (1939) 254 *et seq.;* Glueck, *Criminal Careers in Retrospect* (1943) c. XVII.

If the experience of the District Court for the Southern District of New York—the district having the heaviest volume of federal criminal prosecutions—is a fair guide, the imposition of sentence is more frequently suspended than is its execution. The only practical result of the strained reading of the powers of the district courts by the decision today may well lead trial judges generally to place probationers on probation without any tentative sentence. A construction which leads to such a merely formal result, one so easily defeated in practice, should be avoided unless the purpose, the text and the legislative history of the Act converge toward it. The policy of probation clearly counsels against it, and neither the words of the Act nor their legislative history contradict that policy. So far as it is significant on this phase, the legislative history looks against rather than for such an undesirable construction. In contrast to the present Act, the first measure passed by Congress conferred only the power to suspend execution of sentence and upon its revocation required the defendant "to serve the sentence . . . originally imposed." H. R. 20414, 64th Cong., 2d Sess. (1917). This enactment suffered a pocket veto. In reporting the present legislation to the House of Representatives, its Committee on the Judiciary explained that "In case of failure to observe these conditions [of probation], those on probation may be returned to the court for sentence." H. Report No. 1377, 68th Cong., 2d Sess., 2.

And the text of the legislation does not defeat this policy. Indubitably petitioner was arrested and brought before the court during his period of probation. In that event

the statute is explicit in its direction that "the court may revoke the probation . . . and may impose any sentence which might originally have been imposed." The court having followed the mandate of the statute, it seems irrelevant and unimportant whether petitioner became a probationer either by a postponement of sentence or by a suspension of a sentence already imposed. We cannot say that the statute does not contemplate that the new sentence which it authorizes shall be effective. The obvious purpose is that it should become so either by superseding any sentence earlier imposed or by revoking the suspension of imposition of sentence if none was imposed. Such is the plain meaning and effect of the direction that upon the arrest of the probationer "the court may revoke the probation or the suspension of sentence, and may impose any sentence which might originally have been imposed." In other words, suspension whether of the sentence or of its execution leaves a trial court free to commit the criminal to prison if he fails to meet the test of freedom during the probationary period.

It would be strange if the Constitution stood in the way of a system so designed for the humane treatment of offenders. To vest in courts the power of adjusting the consequences of criminal conduct to the character and capacity of an offender, as revealed by a testing period of probation, of course does not offend the safeguard of the Fifth Amendment against double punishment. By forbidding that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb," that Amendment guarded against the repetition of history by trying a man twice in a new and independent case when he already had been tried once, see Holmes, J., in *Kepner* v. *United States,* 195 U. S. 100, 134, or punishing him for an offense when he had already suffered the punishment for it. But to set a man at large after conviction on condition of his good be-

havior and on default of such condition to incarcerate him, is neither to try him twice nor to punish him twice. If Congress sees fit, as it has seen fit, to employ such a system of criminal justice there is nothing in the Constitution to hinder.