UNITED STATES of America, Plaintiff,

v.

Charles J. MYERS, Defendant.

No. 86 CR 286.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 21, 1994.

Stephen L. Heinze, Asst. U.S. Atty., Chicago, IL, for plaintiff.

Sheldon Nagelberg, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Charles Myers ("Myers") was convicted of various crimes, including tax evasion and fraud in connection with a series of religious scams. Having completed his lengthy prison term, Myers is currently serving a probationary period, one of the conditions of which is that he seek gainful employment so as to be able to satisfy another condition—that of payment of his fines and of making restitution to his victims. Because the efforts of Probation Officer Torrance Wilkins to enforce that obligation are incompatible with Myers' present desire to be trained by his church to become a foreign missionary, Myers has moved to bar the probation officer from requiring him to land a paying position instead. Myers argues that such compulsion violates the Free Exercise Clause of the First Amendment, but for the reasons discussed here that contention proves unsuccessful. Accordingly Myers' motion is denied.

### Background

Following a nearly three-week trial in this pre-Sentencing Guidelines case in June and July 1986, Myers was found guilty by a jury of 47 counts of federal mail fraud and violations of the tax statutes. Among the primary charges was Myers' sale of bogus tax shelters through investments in recordings of Bible stories for children. Myers sold master tapes to investors for $12,000 cash plus a $48,000 note and then fraudulently represented via an opinion letter that the entire $60,000 was at risk for tax purposes (entitling the investors to investment tax credits and depreciation deductions), when in reality the $48,000 notes were a sham insulated from the investors' personal risk by secret "buy-back" agreements. Though Myers' promotional literature specifically disavowed the existence of any such arrangement, investors testified that Myers sent them buy-back guaranties in envelopes marked "Put in Safe Deposit Box." One investor exercised that option and got his money back.

Besides defrauding the tax collectors, Myers also tricked the individual investors as well. By establishing a network of ostensibly distinct entities he was able to project the illusion that the deals involved different sets of sellers, marketers and financiers, all dealing at arms length. Unknown to his investors, however, each of those corporate actors was in fact controlled by Myers. Myers expanded the deception by making phony offers from fictitious parties to buy the tapes for $60,000 and by falsely inflating reports of the sales of the tapes. Thus the $60,000–per–tape sale price was a bogus number fa-

bricated by Myers, rather than a true reflection of the tapes' fair market value.[1]

In addition to that illegal scheme, Myers engaged in a range of other misconduct also bearing on his character. For example, he was convicted of offenses relating to his position as an anti-taxation advocate. After having been audited by the IRS, in 1983 he formed a tax protestor movement called the "Tax Free Club," from which platform he conducted seminars and appeared on radio and television to spread the spurious message that Americans have a Fifth Amendment right to decline to report their income. Then he founded the Northbrook Bible Church (complete with church stationery) as a religious trust to accept donations for his tax "services," and he began to go by the title Rev. Myers, D.D. (claiming to have received a "Doctor of Divinity" degree from Zion Faith College).

At Myers' trial the government introduced evidence of fees totalling more than $7,000 paid by people to attend his seminars. Each person unfortunate enough to have followed Myers' groundless advice by filing an "exempt" W-4 form (on the basis of the Fifth Amendment) was later assessed a $500 frivolous return penalty, and at least one such client was indicted by the State of Illinois on that basis.

Unfortunately the list of Myers' transgressions did not end there. Myers was also convicted for failing to file annual personal income tax returns for certain years during the 1980s and for agreeing in 1985, in exchange for a $10,400 cash payment, to backdate a lease document for someone who came to Myers for tax advice (but who later proved, to Myers' dismay, to be an undercover IRS agent). Also captured on the undercover agent's concealed audiotape was Myers' offer to help the agent establish a bogus religious trust for tax evasion purposes.

It is perhaps an understatement to say that all of that added up to a flagrant pattern of fraudulent activity. As this Court characterized Myers' conduct at the time of sentencing (Tr. 25):

> That is, indeed, overall the most egregious tax fraud case that has come before me. It should not be limited, indeed, by labeling it a tax fraud. It is one of the most egregious cases of any kind of fraud that has come before me. It must be, in my view, responded to in kind.

Based on that assessment this Court sentenced Myers to an 11–year term in the custody of the Attorney General. In part the Judgment and Commitment Order obligated Myers to pay $85,000 in fines to the government and to make some $3,000 in restitution payments to the individuals injured by his deceptive activities (see Myers' current motion ("Motion") Ex. 9).[2]

Throughout the entire period of his trial and internment, Myers has never expressed any degree of remorse, much less owned up to his responsibility in creating hardship for others. To the contrary, he has in the past inundated this Court with a series of letters

---

1. Little wonder that Myers was able and willing to cancel the nonrecourse $48,000 notes on demand, given the far lower real value of the tapes.

2. This Court noted at Myers' sentencing (Tr. 25) that though "[a]ll of the evidence reflect[ed that] a large amount of money" had flowed through Myers' hands, he claimed to be virtually penniless. As this Court explained in a later opinion addressing Myers' 28 U.S.C. § 2255 ("Section 2255") motion 1989 WL 56179, at *1 (1989 U.S.Dist. LEXIS 5737, at *3–*4 (N.D.Ill. May 9) (footnote omitted)):

> At sentencing this Court thus confronted a defendant whose criminal activities had generated a great deal of money, but who by his own account had no net worth at all. This Court had no knowledge of whether that account was true or false (and if the former, how the money

had been dissipated; if the latter, where the money was stashed away). What this Court therefore did was to include as part of Myers' sentence a fine commensurate with the fraud and the ill-gotten gains involved, while at the same time inviting a motion under Fed. R.Crim.P. ("Rule") 35(b) if the apparent financial paradox could be explained and Myers were shown to be incapable of handling the fine. That seemed—and still seems—to this Court a reasonable course, because only Myers had the ability to unravel the intricate financial skein he had devised.

Myers ignored that invitation to provide objective evidence that would enable a fresh and fully informed look at the question. And so far as this Court can tell from the Court of Appeals' unpublished opinion, he also launched no attack in that court on the fine that had been imposed as an element of his sentence.

expounding an array of reasons as to why he should be let off the hook notwithstanding all of the evidence against him and the jury's adverse determination.[3] All of Myers' pro se motions to that end have been found wanting and have been denied without exception.

Myers was released from prison on March 26, 1993 (reflecting his earning of good-time credits), and he is now serving a five-year period of probation running concurrently with his mandatory release supervision set to expire on April 5, 1997. Although the conditions of his probation include the requirement that he fulfill his responsibilities to pay his fines and restitution, he has made no such payments since his release. In that respect, even though he still professes to be destitute Myers has declined to go out to seek a job despite the emphatic exhortations of his probation officer to do so.[4] And Myers' reason for eschewing gainful employment is the subject of his current motion.

### Myers' Current Motion

Myers claims finally to have found his true God. Now he aspires to perform missionary field work for the Church of Christian Liberty ("Church") based in Arlington Heights. To qualify for that endeavor he is participating in what Senior Pastor Dr. Paul Lindstrom has characterized (in a letter to Probation Officer Wilkins, Motion Ex. 6) as a special "customized training program for one person" under the supervision of various Church personnel. Pastor Lindstrom antici-

pates that Myers' training will last approximately two more years (including a stint in the Philippines, travel restrictions permitting[5]), after which he will be "sent out to one of [the Church's] mission fields" to establish Christian schools in faraway places (*id.*).

Of course the catch in that arrangement in terms of Myers' court-ordered obligations is that such employment does not pay any salary, so that he would be in no position to reimburse the government or his other victims. In fact, far from discharging those financial obligations, Myers' activities have actually incurred new debts in the form of "deaconal expenses (food pantry, thrift shop, housing, etc.)"—items that the Church expects him to repay (*id.*).

Myers' decision has provoked Probation Officer Wilkins to insist that Myers find a more lucrative occupation. In addition to several oral admonitions, the probation officer wrote Myers on May 5, 1994 that he had not been excused from pursuing a salary and instructing him to "do [his] very best to find employment no later than June 8, 1994" (see Motion Ex. 9).[6] In an effort to pursue the missionary lifestyle of his choosing free from Wilkins' contrary commands, Myers has filed the current motion entitled "Motion To Bar Probation Office From Compelling Defendant To Abandon His Religious Vocation And Using His Governmental Position To Force His Own Religious Beliefs." In a supple-

---

**3.** Myers' post-sentence persistence has already occasioned at least a half-dozen opinions by this Court. After his conviction was affirmed by our Court of appeals in an unpublished disposition (see 843 F.2d 500 (7th Cir.1988), this Court denied Myers' Rule 35(b) motion for modification of his sentence (as well as his stridently self-righteous "motion to reconsider," replete with Bible citations rather than case references), 1988 WL 105345, 1988 U.S.Dist. LEXIS 11158 (N.D.Ill. Sept. 30); *id.*, 1988 WL 105345, 1988 U.S.Dist. LEXIS 11917 (N.D.Ill. Oct. 14), and his later Section 2255 motion challenging his sentence, No. 90 C 946, slip op. (N.D.Ill. Mar. 2, 1990).

**4.** Among the standard conditions in this District Court's "Conditions of Probation and Supervised Release" form is this obligation:

(5) You shall work regularly at a lawful occupation unless excused by the probation offi-

cer for schooling, training, or other acceptable reasons.

**5.** On September 28, 1993 this Court modified the conditions of Myers' probation by granting him permission to travel outside the Northern District of Illinois (including international travel) for the purpose of participating in his church's missionary training program, so long as he gives the probation department advance notice.

**6.** Myers devotes a fair portion of his argument to accusing Probation Officer Wilkins of preaching his own religious values and of becoming obsessed with Myers' decision to the point of a personal vendetta, an accusation that the probation officer denies with equal vigor. This opinion does not need to address that dispute, because the fine and restitution obligations at issue were imposed by this Court and not the probation officer.

ment to the motion (cited here as "Supp.—") Myers explains (Supp. 2):

> The original intent of the *Motion to Bar* was to give the message to the court that Mr. Myers was not refusing to pay his fines and pay his restitution, but that presently he was sincerely committed to a program of religious instruction and service, which made it impossible *at this time* to afford to pay fines and restitution; Mr. Myers was not writing off this obligation entirely.... He simply wants to become a missionary, and not be forced to quit and abandon this endeavor because his probation officer says he must in order to pay off his fines and restitution.

Myers thus attempts to paint his prayer for relief as no more than a temporary respite from his fine payments and restitutive obligations, the present enforcement of which he contends is incompatible with the free exercise of his religious convictions.

That portrayal seems somewhat disingenuous. It would appear that Myers' completion of the program to enable him to operate as a foreign Church emissary would likely enable him to live out the remainder of his years without *ever* needing to secure a compensable job. After all, concurrently with his assertion that he intends to make good on his debts just as soon as he qualifies to become a missionary, Myers alternatively attempts to derive rhetorical advantage from his advancing age (Supp. 8) and from his argument that the only work he can see himself getting would necessarily be something excessively undesirable along the lines of flipping burgers (*id.;* Motion 2–3).

■ All of that might well lead to questioning the sincerity of Myers' assertion that his desire for religious training is intended not to evade but merely to defer satisfaction

of his fines and restitutive obligations until a later date.[7] But it is unnecessary to accept Myers' invitation to pass on his actual sincerity vel non, for even on a favorable resolution of that issue Myers' current motion fails. It fails because he has not established any violation of the First Amendment in any case. Put simply, Myers has not established that the enforcement of an obligation to seek employment to repay his debts interferes with his right to free exercise of religion.

For starters, Myers' argument is effectively foreclosed by the latest word on freedom of religion to have emanated from the highest secular authority on the subject. In the course of holding that Oregon could deny unemployment benefits to two Native Americans who had run afoul of the state's laws proscribing hallucinogenic drugs, despite their argument that their sacramental use of peyote was protected activity (*Employment Division, Dep't of Human Resources v. Smith*, 494 U.S. 872, 878, 110 S.Ct. 1595, 1600, 108 L.Ed.2d 876 (1990)), the Supreme Court explained that "if prohibiting the exercise of religion ... is not the object of the [government action] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." It went on to expand on that concept (*id.* at 878–79, 110 S.Ct. at 1600):

> We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition. As described succinctly by Justice Frankfurter in *Minersville School Dist. Bd. of Ed. v. Gobitis*, 310 U.S. 586, 584–595 [60 S.Ct.

---

**7.** Throughout his submissions Myers repeatedly implores this Court to investigate the sincerity of his devotion (Supp. 2, 3–5, citing such cases as *Menora v. Illinois High School Ass'n*, 683 F.2d 1030 (7th Cir.1982) and *Witmer v. United States*, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955)). That invitation conjures up the parable of the boy who cried "Wolf!" It is unnecessary to recapitulate all of Myers' fraudulent misdeeds to recognize that Myers has not in the past demonstrated any inhibition against using religion as a pretext for personal gain, as by falsely claiming to have

earned a Doctor of Divinity degree, hiding behind a "church" that he set up to avoid paying income taxes (and offering to set up a like scheme for others) and running a tax scam based on children's Bible stories (United States Mem. 4–5). Thus, Myers' self-interested protestations of earnestness notwithstanding, it is difficult to see how his invocation of the sincerity factor could work other than against him. Religion recognizes the legitimacy of even last-minute redemption, but it does not command the surrender of legitimate skepticism on that score.

1010, 1012–1013, 84 L.Ed. 1375] (1940): "Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities (footnote omitted)." We first had occasion to assert that principle in *Reynolds v. United States*, 98 U.S. [ (8 Otto) ] 145 [25 L.Ed. 244] (1879), where we rejected the claim that criminal laws against polygamy could not be constitutionally applied to those whose religion commanded the practice. "Laws," we said, "are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.... Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." *Id.*, at 166–167.

*Smith* thus dictates an examination of the legitimacy of the governmental action (here the enforcement of the probationary condition) in and of itself, divorced from consideration of unintended effects that may happen to prove inimical to religious pursuits. That teaching is highly instructive in the present context, where the United States seeks nothing more than to implement a facially unobjectionable directive, a standard condition of probation requiring former miscreants to seek employment to enable them to pay their fines and to repay the victims of their crimes. In light of *Smith*, the enforcement of that obligation is not rendered invalid by its side effect of rendering Myers' all-consuming religious endeavors more difficult or even impossible.

This conclusion is reinforced by the extent to which Myers remains free to exercise his religion even while saddled with the entirely reasonable responsibility to obtain gainful employment to facilitate payment of fines and restitution. Myers does not (and cannot) contend the government is obstructing his ability to believe, practice or worship Christianity in any way other than the frustration of his desire to pursue missionary status on a *full-time* basis. And while Myers would evidently prefer to continue to avoid facing his debts straightaway, he has proffered no reason why he cannot live up to his fine payments and restitutive obligations during normal working hours and avail himself of the tutelage of his Church at night or on the weekends.[8] Under the circumstances it does no violence to the Free Exercise Clause to enforce the condition that Myers pay his fines and make his victims whole (see *United States v. Ofchinick*, 937 F.2d 892, 898 (3d Cir.1991), upholding a probationary condition requiring defendant (a pastor) to pay $1,000 per month in restitution despite his argument that the condition violated the Free Exercise Clause by precluding him from making monthly $600 contributions to his church; *United States v. Tolla*, 781 F.2d 29, 36 n. 3 (2d Cir.1986), rejecting a First Amendment argument against a condition proscribing the teaching of religious school).[9]

---

8. In a sense what has been said here, and what is said in the remainder of this opinion, might itself be thought to find root in Scripture (Mark 12:17):

Render, therefore, to Caesar the things that are Caesar's, and to God the things that are God's.

9. Although another series of cases is not directly on point, it is worth noting that many sister circuits have upheld probationary conditions against defendants' contentions that those conditions impinged on their First Amendment rights in contexts other than religion (see, e.g., *United States v. Hughes*, 964 F.2d 536, 542–43 (6th Cir.1992), prohibiting association with union-financed political action committees; *United*

*States v. Bolinger*, 940 F.2d 478, 480 (9th Cir. 1991), prohibiting membership in motorcycle clubs; *United States v. Peete*, 919 F.2d 1168, 1180–81 (6th Cir.1990), prohibiting defendant from seeking or serving in an elected public office; *United States v. Schiff*, 876 F.2d 272, 277 (2d Cir.1989), prohibiting a convicted tax evader from advocating noncompliance with the tax laws; *United States v. Gracia*, 755 F.2d 984, 991 (2d Cir.1985), proscribing association with terrorists; *United States v. Lawson*, 670 F.2d 923, 930 (10th Cir.1982), prohibiting membership in tax protest organization; cf. *United States v. Ramsey*, 992 F.2d 831, 833 (8th Cir.1993), compelling a defendant to file tax returns and pay taxes).

Indeed, even if Myers were able to establish that the condition in question does burden the exercise of his religious aspirations, he would still lose. This Court wields considerable discretion in sentencing and accordingly in setting appropriate terms of probation (*Tolla,* 781 F.2d at 32).[10] One aspect of that broad leeway is the power to establish conditions that may encroach to a degree on a probationer's personal liberties (*Schiff,* 876 F.2d at 275) ("in setting conditions of probation the discretion given to the district court is broad and many conditions that may infringe on a person's constitutional rights have been approved"); *Peete,* 919 F.2d at 1181 ("Probation restrictions may affect fundamental rights such as freedom of speech and freedom of association if the conditions are primarily designed to meet the ends of rehabilitation and protect the public").

It is of course possible that a given probationary condition can be so offensive constitutionally as to overstep the sentencing court's broad discretion, as Myers contends to be the case here. Resolution of that type of dispute first requires an inquiry into the appropriate standard against which the condition should be evaluated, a question to which this opinion now turns.

Myers would invoke the venerable decision in *Sherbert v. Verner,* 374 U.S. 398, 406–09, 83 S.Ct. 1790, 1795–97, 10 L.Ed.2d 965 (1963), which invalidated as unsupported by a "compelling state interest" (*id.* at 406, 83 S.Ct. at 1795) an employee's disqualification from unemployment compensation because of his refusal to work on the Sabbath.[11] Aside from the fact that the Supreme Court has *never* (outside of the context of unemployment benefits) invalidated another governmental action on the basis of the *Sherbert* test (and has in fact refrained in recent years from even applying it, see *Smith,* 494 U.S. at 883, 110 S.Ct. at 1602), Myers has a much more serious problem: His claim rests on a footing distinct from—and considerably less secure that—that of the *Sherbert* plaintiff.

Because Myers is a convicted swindler now on probation, his situation calls for a different analysis. As *United States v. Williams,* 787 F.2d 1182, 1186 n. 9 (7th Cir.1986) (per curiam) has said in upholding a different condition of probation:

> Our conclusion that urine testing is reasonable here is predicated, quite obviously, on the fact that Williams is a probationer, not an ordinary citizen. We express no opinion as to the reasonableness of urine testing in any other context.

Here the government would go even further, asking this Court to adopt the lesser standard of scrutiny applicable to inmates residing in penal institutions (*O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). In holding that Muslim inmates could be denied the right to congregate for a Friday afternoon religious service, *O'Lone, id.* at 349, 107 S.Ct. at 2405, quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), explained:

> [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.

Myers counters that the *Turner–O'Lone* test is based substantially on concerns for institutional security, a factor not relevant in the probation context.

Neither extreme position as to the appropriate standard, as urged on this Court by the litigants, is persuasive. Instead the relevant standard is signaled by *Williams,* 787 F.2d at 1185 (footnote omitted), quoting *United States v. Pierce,* 561 F.2d 735, 739 (9th Cir.1977):

> When necessary, the sentencing court has discretion to impose conditions that impinge on otherwise inviolable rights. In determining whether a probation condition unduly intrudes on a constitutionally-protected freedom, a reviewing court evaluates the condition in the following context:
>
> > The conditions must be "reasonably related" to the purposes of the [Probation]

---

10. This like *Tolla* is a pre-Guidelines case, though it does not appear that the greater curbs on judicial discretion in sentencing imposed by the Guidelines extend to limiting the permissible conditions of probation.

11. In *Sherbert* that meant Saturday, for the employee was a devout Seventh Day Adventist.

Act. Consideration of three factors is required to determine whether a reasonable relationship exists: (1) the purposes sought to be served by probation; (2) the extent to which constitutional rights enjoyed by law-abiding citizens should be accorded to probationers; and (3) the legitimate needs of law enforcement.

■ Application of that test to the current situation permits of only one answer. Plainly the employment mandate imposed on Myers is reasonably related to the purposes of the Probation Act, as summarized by *United States v. Yancey,* 827 F.2d 83, 87 (7th Cir.1987):

> The general purposes of the Probation Act are best expressed in *Roberts v. United States,* 320 U.S. 264, 64 S.Ct. 113, 88 L.Ed. 41 (1943), where the Court noted probation serves to allow an offender the opportunity for rehabilitation,
>
> > without institutional confinement under the tutelage of a probation official and under the continuing power of the court to impose institutional punishment for his original offense in the event that he abuses this opportunity. To accomplish this basic purpose Congress vested wide discretion in the courts.

Although what is said there does not exhaust all of the policies served by sentencing (for example, the statement quoted from *Roberts* omits any reference to general and specific deterrence and to incapacitation of the defendant), this opinion will briefly examine the two purposes that *are* mentioned there: rehabilitation and punishment.

As for the goal of rehabilitation, Myers contends that it would best be served by permitting him to forgo gainful employment so that he could prepare to become a missionary. *Tolla,* 781 F.2d at 34 has considered and rejected a like argument in a like context:

> In petitioning the court to lift its restriction [against teaching], appellant emphasized the satisfaction that she derived from teaching religious education to young people at St. Gabriel's. Denying her that satisfaction during a period of one year should serve as a potent but not unreasonable deterrent against the temptation to [repeat her misconduct] in the future, therefore reinforcing her continued rehabilitation.

That reasoning, coupled with this Court's concern for payment of the fines imposed and for proper restitution to the direct victims of Myers' malfeasance, calls for the same conclusion here.

■ And as for the punitive purpose of sentencing, any person who commits crimes against society can properly expect one or more constraints that may be characterized as punishment, any of which may curtail his liberty in meaningful ways. Crimes meriting prison terms, for example, give rise to all kinds of restrictions on the confined person's ability to exercise fundamental freedoms such as the rights to travel, to bear arms and to worship one's religion where one pleases, as well as rights of consortium and privacy (see *Rowe v. DeBruyn,* 17 F.3d 1047, 1049–50 (7th Cir.1994) ("Imprisonment, however, necessarily entails that an inmate lose many of the rights ordinary citizens enjoy")). In the same way, a convict who is fortunate enough to have been afforded a probationary alternative to continued incarceration also has more limited grounds for complaint than might a citizen with an unblemished record. Thus, for example, *Hughes,* 964 F.2d at 543 justified an invasive restriction in these terms:

> Admittedly, Hughes' ability to exercise his right to associate with political action committees and to participate in an activity in which union members have contributed in their individual capacities is limited by the court's order. However, we find this limitation on Hughes' First Amendment rights to be necessary when balanced against the right of the community to have uncorrupted union-financing of political action committees. Hughes' conduct following his first sentencing clearly demonstrates that he is still a threat to the public in this regard.

That too supports the denial of Myers' motion.

### Conclusion

More than one legal perspective calls for the denial of Myers' motion, while none sup-

ports the relief he seeks. This Court denies the motion.