**UNITED STATES of America**

v.

**Thomas S. WALDRON**

**No. CR. 93–14–A.**

United States District Court, M.D. Louisiana.

Feb. 27, 2004.

United States of America, by David R. Dugas, United States Attorney, Ian F. Hipwell, Assistant U.S. Attorney, James L. Nelson, Assistant U.S. Attorney, Baton Rouge, for the United States.

Hillar C. Moore, III, Baton Rouge, E. Thomas Royals, Royals and Mayfield, Jackson, MS, for Defendant.

## RULING ON PETITION TO REVOKE PROBATION

JOHN V. PARKER, District Judge.

This matter is before the court on a petition to revoke the defendant's probation. On October 26, 1993, Waldron was convicted by a jury of six counts of making false statements to a federally insured financial institution, in violation of 18 U.S.C. §§ 1014 and 2. On February 4, 1994, he was sentenced to serve consecutive terms of imprisonment of 18 months on each of counts III and IV of the indictment and was ordered to pay a $1 million fine on each of those two counts, to be paid immediately. The court suspended imposition of sentence on count V and placed Waldron on five years probation to commence upon his release from prison. Imposition of sentence was suspended for the remaining three counts of conviction, counts VI, VII, and VIII.

Waldron was released from prison on April 28, 1998 and began his term of probation. On April 22, 2003, his probation officer filed with this court a "Petition for Warrant or Summons for Offender under Supervision" (doc. 222), requesting that the court issue a summons to Waldron for violation four of his conditions of probation. On the basis of the petition, Magistrate Judge Christine Noland ordered the issuance of a summons, which was served upon Waldron on April 23, 2003. He made his initial appearance on April 28, 2003. On May 22, 2003, a revised "Petition for Warrant or Summons for Offender under Supervision" (doc. 233) was filed, which

alleged the same four violations of conditions of probation but added details concerning the violations. Waldron filed a motion to dismiss the summons/warrant and petition to revoke his probation, which was denied by the court (doc. 256). An evidentiary hearing on the petition to revoke his probation was held on December 2, 2003. Post-hearing briefs have been filed by both parties.

The government and Waldron entered a signed stipulation (doc. 259) in which Waldron admits that he committed violations 2, 3, and 4 of the petition. Thus, the only issue before the court at this time is whether the evidence establishes violation number 1 of the petition, that Waldron committed a crime, a violation of a condition of probation. The petition reads as follows:

Nature of Non-compliance: In order for the defendant to gain access to the use of, and activate his ability to use various credit cards, the defendant provided or caused to be provided to various credit card companies the Social Security number assigned by the Commissioner of Social Security to his son, then aged 19 and 20. This knowing use of someone else's Social Security number "for any other purpose" is a violation of Title 42, United States Code, Section 408(a)(7)(B), and was done to keep his probation officers from knowing that he had access to and was charging purchases on those credit cards.

The criminal statute at issue, 42 U.S.C. § 408(a)(7)(B), makes it a felony for anyone to do the following:

(7) for the purpose of causing an increase in any payment authorized under this subchapter (or any other program financed in whole or in part from Federal funds), or for the purpose of causing a payment under this subchapter (or any such other program) to be made when

no payment is authorized thereunder, or for the purpose of obtaining (for himself or any other person) any payment or any other benefit to which he (or such other person) is not entitled, or for the purpose of obtaining anything of value from any person, or for any other purpose -

\* \* \* \* \* \*

(B) with intent to deceive, falsely represents a number to be the social security account number assigned by the Commissioner of Social Security to him or to another person, when in fact such number is not the social security account number assigned by the Commissioner of Social Security to him or to such other person;

The elements of the crime are: (1) false representation of a social security account number, (2) with intent to deceive, (3) for any purpose. *United States v. Means,* 133 F.3d 444, 447 (6th Cir.1998). Therefore, the government must satisfy the court that, with the intent to deceive his probation officers by preventing them from learning of his credit card use, Waldron falsely represented his son's social security number to be his own when he obtained credit cards.

There were four credit cards at issue in the case: an American Express card, an Advanta Mastercard, a Bank One Visa, and an American Express Delta Skymiles card. All but the Delta Skymiles card were issued to Waldron as a supplemental cardholder on the company accounts of Midpoint Construction Company, a company owned by Meridith Brown. The Delta Skymiles card was not on a company account, but was on Ms. Brown's personal account. The cards were all in the name Thomas S. Waldron or Thomas Waldron. Certified records from all the credit card

companies with the exception of Bank One show that, when Waldron was added as a cardholder to the accounts, the social security number provided was that of his son, Thomas S. Waldron, Jr. ("Tommy"), who was nineteen and twenty years old at the time.[1] Certified records from Bank One show that on September 3, 1999, Ms. Brown called and had the credit card company change the social security number that it had on file for Waldron. The number was changed from Waldron's number to that of his son.

Ms. Brown, an Oklahoma City real estate broker, testified that she has known Waldron since the fall of 1998. She met him when he approached her for assistance in locating property that could be used to supply fill dirt for the Bell Isle project, an Oklahoma City construction project with which Waldron was involved. She testified that she later formed Midpoint Construction Company in order to assist Waldron in performing site and excavation work at Bell Isle. And though Ms. Brown was the sole owner of Midpoint Construction Company and its sole shareholder, Waldron was very much involved with the company. She provided local business contacts and banking relationships, while he provided his knowledge and expertise in the field.

According to Ms. Brown, the Bank One card was the first card that she got acquired for Waldron. This occurred in April 1999. She needed Waldron's social security number in order to add him as a cardholder on the account and testified that when asked, Waldron gave her his correct social security number, which she then provided to the bank. The next card for which she applied on Waldron's behalf was the American Express card in May 1999. Ms. Brown testified that this time,

---

1. The correct social security numbers for both defendant Waldron and his son Tommy have been verified through certified documents provided by the Social Security Administration.

when asked, Waldron gave her his son's social security number. She testified that she did not then realize the discrepancy, as she had not committed Waldron's social security number to memory.

Ms. Brown stated that she became aware of the fact that the social security numbers were different in September 1999 when Waldron asked her what number was listed on the Bank One account. When advised, he told her to change it to the number on the American Express account since the "government could not know he had the use of those credit cards." Ms. Brown testified that she did what Waldron asked—called Bank One and told the representative that she had previously given the wrong social security number. She then provided the number of defendant's son, Tommy. She admitted in her testimony that she falsely represented to the bank that the card was intended for Tommy and that she had mistakenly given the bank his father's social security number when the card was activated. Bank One's certified records confirm that such a change was made by Ms. Brown on September 3, 1999.

With respect to the two remaining credit cards, Ms. Brown testified that she asked Waldron for a social security number to use when filling out his paperwork, and both times he told her to use his son's number. She admitted in her testimony that by that time, she knew Waldron was misrepresenting his son's social security number to be his own to the credit card companies.

After Waldron was injured in an accident and had to be taken to the emergency room, Ms. Brown was involved in communications with the hospital and the insurance company in an attempt to have his $5,000 bill paid. She testified that at some point, the hospital let her know that it had the wrong social security number for Waldron; the number it had was that of a twenty-one year old man. She testified that at that time she told Waldron that she would no longer be involved in giving anyone a false social security number for him.

Judith Guthrie, United States Probation Officer for the Southern District of Florida, was one of Waldron's probation officers. She testified concerning the difficulty she had getting Waldron to disclose information regarding his income and assets. She testified that, although Waldron disclosed that he sometimes used the credit cards of both a girlfriend, Judy Circo, and his son, he never told her he was using his son's social security number to obtain his own credit cards. In December 1999, Ms. Guthrie instructed Waldron to provide her with an accounting of all credit cards he was using, including any that were in the name of his son. However, of the four credit cards at issue in this case, he disclosed only the Midpoint American Express card. He never disclosed to the probation officer that the American Express card had been obtained using his son's social security number. Waldron also did not disclose to Ms. Guthrie that he had the use of the other three cards, despite her requests for updated credit card usage information, nor did he ever provide her with copies of those cards.

The defense offered the testimony of the defendant's brother, James Waldron, who is also in the construction business. He testified that, at the request of his brother and Ms. Brown, he did work remodeling a home in Jackson, Mississippi in the summer of 2000. Both Ms. Brown and James Waldron testified that James Waldron had a Midpoint Construction Company credit card to use for business expenses while in Jackson. However, James Waldron testified that the credit card had the name "Thomas" or "Tom Waldron" on it and actually belonged to his nephew Tommy. He stated that it was "common knowl-

edge" that Midpoint's credit card was in Tommy's name because "he had the credit." [2] According to James Waldron, defendant Waldron was not able to get a credit card because he had been in prison and, therefore, Tommy allowed Midpoint's credit card to be put in his name. James Waldron testified that Ms. Brown had given him permission to use the card and told him to sign the name "Thomas Waldron" when he used it, which he did.

Ms. Brown flatly denied this. Although she said James Waldron did have a Midpoint card that he took with him to Jackson for business expenses, she testified that she did not tell him the card belonged to Tommy or for him to sign the name "Thomas Waldron" when he used the card. She said that the credit card was in the name of defendant Waldron, not his son, and was to be used by defendant.

Tommy testified that in 1999 or 2000, he granted his father's request to obtain a Midpoint Construction Company credit card in his name. In exchange, Tommy's cell phone and health insurance were to be paid, and he mistakenly thought he would get an increase in his credit rating. When he visited Oklahoma, he recalled going into Ms. Brown's office to sign documents, but claimed not to have known what those documents were. He testified that he worked in Jackson for his Uncle James, and he had also used a credit card for various business expenses during the course of the job. However, he could not remember the name on the credit card. As a general matter, Tommy also testified that he gave his father standing permission to use his social security number to obtain any other credit cards.

First, the court does not find the testimony of James Waldron to be credible. He gave vague and inconsistent responses throughout the hearing, and the court does not give any credence to his testimony that it was common knowledge that the Midpoint Construction Company credit card he used while in Jackson belonged to his nephew Tommy. Furthermore, he only testified regarding the one Midpoint Construction Company credit card he used in Jackson. He could not identify which card that might have been, and he offered no testimony regarding the other three credit cards at issue. Therefore, the court finds his testimony essentially useless.

With respect to Tommy's testimony, he only worked as a "gopher" for Midpoint occasionally on his breaks from college. He used a credit card while in Jackson, but could not recall the name that was on it. Although he testified that he had given his father permission to obtain a credit card in his name, that is beside the point. Whether the defendant had his son's "permission" to use the social security number is not the issue. Of interest to the court is the use to which the defendant put the number and his intent in doing so. In determining whether Waldron violated 42 U.S.C. § 408(a)(7)(B), the issue of concern is not the credit cards, but Waldron's false representation of a social security number in order to obtain the credit cards and his intent to deceive his probation officers about his use of them.

The court finds credible the testimony of Ms. Brown that she obtained the credit cards on behalf of Waldron and in Waldron's name, not the name of his son, and that the credit cards were to be used by Waldron. The cards at issue are in the name "Thomas Waldron" or "Thomas S. Waldron," without the "Jr." abbreviation. Ms. Brown was the owner of Midpoint and, therefore, had the first-hand knowledge of

**2.** The notion that a nineteen or twenty-year-old college student doing "gopher" construction work between semesters had any substantial credit standing is one that the court finds hard to believe.

its finances and credit card accounts. She is the person who would have had the authority to add an authorized user to the credit card accounts. The court accepts Ms. Brown's testimony that the credit cards at issue were obtained through Waldron's false representation of his son's social security number as his own. The documentary evidence from the credit card companies supports her testimony.

 The elements required to establish a violation of 42 U.S.C. § 408(a)(7)(B) are: (1) false representation of a social security account number, (2) with intent to deceive, (3) for any purpose. *Means*, 133 F.3d at 447. In deciding whether to revoke probation, the court exercises broad discretionary power akin to that utilized in imposing the probated sentence initially. Evidence that would establish guilt beyond a reasonable doubt is not required in order for the court to revoke probation. All that is required is that the evidence and facts be such as to reasonably satisfy the judge that the conduct of the probationer has not been as good as required by the conditions of probation. *United States v. Francischine*, 512 F.2d 827 (5th Cir.1975), cert. denied, *Francischine v. U.S.*, 423 U.S. 931, 96 S.Ct. 284, 46 L.Ed.2d 261 (1975). Where, as here, the probationer has been accused of committing a crime, his guilt need not be proved beyond a reasonable doubt before probation may be revoked. A revocation proceeding is not the trial of a criminal case and a probation revocation proceeding cannot result in a criminal conviction. *Amaya v. Beto*, 424 F.2d 363 (5th Cir.1970). All that is necessary is that the judge is reasonably satisfied that a state or federal law has been violated. *United States v. Carrion*, 457 F.2d 808 (9th Cir. 1972).

 The court is satisfied, through the testimonial and documentary evidence, that Waldron violated condition of probation number 1 by falsely representing his son's social security number to be his own, with the intent to deceive his probation officer regarding his financial affairs.

As noted, *supra*, the defendant has stipulated (doc. 259) that he did indeed violate condition of probation number 4 (violation number 2), condition of probation number 10 (violation number 3) and condition of probation number 15 (violation number 4).

Under violation number 2, the defendant admits that he failed to reveal the truth to his probation officers about his income and access to monies during his period of probation. The probation officers were not idly curious about Waldron's financial affairs. He had been sentenced to pay a fine of $2 million and the probation officers were constantly attempting to discover information about his financial affairs in order to monitor his payment of the fine. The defendant also admits that he failed to follow the instructions of his probation officers to file federal income tax returns for the years 1998, 1999, 2000, and 2001 as instructed. He told his probation officer that failure to file a tax return is only a misdemeanor, while filing a false tax return is a felony. The defendant indicated that he would just "take his chances" for non-filing on a misdemeanor charge.

Under violation number 3, the defendant admits that he knowingly associated with and continued to associate with a convicted felon, one George Allen, after being instructed by his probation officer to cease that association.

Under violation number 4, the defendant admits that he failed to make any meaningful attempt to pay the fine imposed by his sentence which is condition of probation number 15.

The Revised Petition for Revocation sets forth that the defendant "cleverly attempted to falsely project a modest lifestyle by distancing himself from and hiding his re-

ceipt of substantial income and assets." Further, the defendant "has hidden behind claims of reimbursable 'expenses' rather than 'income' and created fraudulent claims of debt ... [and defendant] has followed a years long pattern of deception, purposefully creating the appearance of having modest or practically no income, while simultaneously enjoying an expensive lifestyle." Finally, the Petition for Revocation on this violation concludes:

The following facts demonstrate that while under supervision between 1999 and 2003, the defendant received, controlled, and/or had access to monies totaling in excess of $3.8 million dollars, comprising ample resources available to him which could have been used to pay the criminal debt. By failing to pay any of this substantial amount of money toward his fine, Waldron has violated the conditions of probation and revocation is justified.

It is significant that in the nine years after the sentence was imposed and before the filing of the Petition for Revocation, Waldron paid only $69,483.61 toward his fine of $2 million. Of that amount, only $30,250.00 was voluntarily paid by the defendant. The other sums acquired by the government were obtained through court action—a bond forfeiture and the seizure of funds which the government uncovered in an account in defendant's name in the office of the Florida Comptroller.

In the stipulation confessing to violations (doc. 259), the defendant casts his failure to pay the fine as a "technical" violation of this condition of probation. The court concludes that there was nothing "technical" about Waldron's failure to pay a more substantial amount toward reduction of his fine.

█ █ It is well established that our law does not permit the revocation of probation for a defendant's failure to pay the amount of fines if that defendant is indigent or otherwise unable to pay. In other words, the government may not imprison a person solely because he lacked the resources to pay a fine. However, imprisonment is certainly authorized for willful refusal or failure to pay a fine where the defendant has the means to do so. Similarly, a probationer's failure to make a sufficient bonafide effort to seek the financial means or to utilize the resources available to him to pay a fine may certainly authorize revocation of probation and imposition of a prison sentence. *See Bearden v. Georgia*, 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983).

To put it another way, the law requires a defendant to make a bonafide effort to pay any fine imposed as a condition of probation. It is quite clear that Waldron did not make such an effort and that, indeed, he has deliberately and willfully avoided the payment of this debt.

The stipulation of violations (doc. 259) admits that over a four-year period, some $3.9 million flowed through the persons and entities outlined in the petition for revocation and that Waldron had control over those persons and entities. Waldron denies that "all or even most of that money could have been used to pay his fine" but does admit that the amount available to pay toward the fine "could have reached or possibly exceeded $250,000" and that the defendant thus "is in violation of condition of probation number 15."

At the time he committed the crimes for which he was sentenced in this district, Waldron was a very successful south Florida real estate developer. He owned substantial assets and had access to large sums of money and owned or controlled several different business entities, including Coplin USA, Inc., Diamond C. Holdings, Inc., Diamond C Land & Cattle, Diamond C Ranch, East Cost Industrial Park, Iteka of Turkey, Rustic Ranches Develop-

ment Corp., Santa Clara Construction, Stonewal Estates, Ltd., Sunbrook Realty Corp., WPB Utah Associates, Quarry of West Palm Beach, Inc.

The presentence report on Waldron prepared by the probation office of this court dated January 25, 1994 contains information indicating that he had a net worth of between $42 million and $51 million at that time. The presentence report notes that even then, obtaining accurate financial information from Waldron was extremely difficult; hence the $51 million may be inaccurate. Significantly, however, he has never challenged the accuracy of that financial information, either at sentencing or in post-sentencing proceedings. Neither has he ever offered any explanation of what happened to his net worth of $40 million to $50 million. It certainly was not applied to the payment of the $2 million fine (with interest and penalties the balance is now about $4.5 million).

The court acknowledges that the information in the presentence report may not be precise, but it is a clear indication that Waldron had access to large sums of money at the time he was sentenced to pay this fine. Waldron admits that he could have paid at least $250,000 on the fine. The court is convinced that had he wanted to do so, he could have paid more. He has not only failed to pay the fine, but he has done so willfully and deliberately and has repeatedly concealed his truthful financial position from the probation officers who were seeking to secure compliance with that condition of probation.

Over a period of nine years Waldron voluntarily paid only $30,250 on the fine, an amount that surely does not indicate a serious effort for a person with the resources to which he had access. As the Revised Petition for Revocation states, Waldron has followed a years-long pattern of deception regarding his assets and financial ability to pay.

One word comes to mind to describe this defendant's conduct—scofflaw—one who treats the law with contempt.

For the foregoing reasons, the court concludes that Waldron's failure to pay any substantial amount of his fine was not because he was indigent; it was because he failed to make a bonafide effort to pay the fine. The evidence establishes beyond doubt that Waldron has deliberately and intentionally violated four conditions of his probation and has done so repeatedly over the entire term of his probation. Under these circumstances, it is clear that respect for the law demands that Waldron's probation be revoked.

The briefs filed by the parties convince the court that since the defendant has served maximum probation, additional probation is not an option. The court therefore turns to the issue of sentence.

With regard to sentencing, this case is governed by the law in effect in 1985, the year the original offenses occurred. *United ed States v. Balboa*, 893 F.2d 703 (5th Cir.1990). The law in effect at that time provided that, in the case of an offense not punishable by death or life imprisonment, the court may "suspend the imposition or execution of sentence and place the defendant on probation for such period and upon such terms and conditions as the court deems best." 18 U.S.C. § 3651. The court may limit probation to one or more counts or indictments, but in the absence of express limitation by the court, probation extends to the entire sentence and judgment. The period of probation, together with any extension thereof, shall not exceed five years. 18 U.S.C. § 3651.

The court sentenced Waldron to consecutive terms of imprisonment of 18 months each on counts III and IV of the indictment and ordered him to pay a $1 million fine on each of those two counts, to be paid immediately. The court suspended imposition of sentence on count V and placed

Waldron on five years probation to commence upon his release from prison. Imposition of sentence was suspended for the remaining three counts of conviction, counts VI, VII, and VIII. As authorized by the statute, the court limited probation to only one count of conviction, count V.

Section 3653 provided that, upon revocation of probation, the court may require the probationer "to serve the sentence imposed, or any lesser sentence, and, if imposition of sentence was suspended, may impose any sentence which might originally have been imposed." As the Supreme Court explained in *Roberts v. United States*, 320 U.S. 264, 64 S.Ct. 113, 88 L.Ed. 41 (1943), there is a difference between suspending the imposition of sentence and suspending the execution of a sentence already imposed. When the court suspends the imposition of sentence and places the defendant on probation, as the court did here, the court is authorized, upon revocation of probation, to impose any sentence within the limits of statutory authority. Merely placing a defendant upon probation is not a sentence under 18 U.S.C. § 3651. *Sims v. United States*, 607 F.2d 757 (6th Cir.1979). Therefore, the court is now authorized to impose any sentence that originally could have been imposed on the four counts of conviction, counts V, VI, VII, and VIII, on which sentence was previously suspended. In 1985, the maximum sentence on each count was two years' imprisonment, so the maximum total sentence available is eight years' imprisonment.

For the foregoing reasons, the court orders that the probation of defendant, Thomas S. Waldron, be **REVOKED**.

The defendant will be notified when to appear for sentencing.